# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

PETER H. KELLY and
STEPHANIE A. KELLY,

        Plaintiffs,


v.                      **MEMORANDUM OF LAW & ORDER**
                              Civil File No. 14-3133 (MJD/TNL)


WELLS FARGO BANK, N.A., and
FEDERAL HOME LOAN MORTGAGE
CORPORATION a/k/a FREDDIE MAC,

        Defendants.

Carl E. Christensen and Daniel M. Eaton, Christensen Law Office PLLC, Counsel for Plaintiffs.

Charles F. Webber and Jessica Z. Savran, Faegre Baker Daniels LLP, Counsel for Defendants.

## I.      INTRODUCTION

This matter is before the Court on cross motions for summary judgment.

[Docket Nos. 37, 44]  The Court heard oral argument on February 12, 2016.

Because the TPP is not an enforceable contract under Minnesota law, the Kellys

never relied on Wells Fargo's statements to their detriment, and they have no

standing under the Minnesota Residential Mortgage Originator and Servicer Licensing Act, the Court grants summary judgment for Wells Fargo.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   The Mortgage and Initial Modifications

On August 22, 2000, Plaintiffs Peter and Stephanie Kelly purchased a house at 848 Interlaken, in Victoria, Minnesota.  (Verified Compl. ¶ 10.)  On December 19, 2001, they refinanced their mortgage loan and conveyed a mortgage to Wells Fargo Home Mortgage, Inc.  (Id. ¶ 11; Am. Compl., Ex. 1.)  At that time, Wells Fargo Home Mortgage, Inc., was a subsidiary of Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), but Wells Fargo Home Mortgage has since merged into Wells Fargo and they are now one entity, Wells Fargo.  (First Eaton Aff., Ex. A, Bosier Dep. 12-13.)  Wells Fargo Home Mortgage, Inc., was the servicer for the loan, and Defendant Federal Home Loan Mortgage Corporation ("Freddie Mac") was the investor.  (Id. 14-15, 64.)

In 2006, the Kellys fell behind in their mortgage payments, and Wells Fargo approved a partial reinstatement/repayment agreement.  (Def. App'x at 111, Peter Kelly Dep. 22; Def. App'x 7-8, May 30, 2006, Stipulated Partial Reinstatement/Repayment Agreement.)

On November 26, 2007, Wells Fargo and the Kellys entered into a Fixed Rate Loan Modification Agreement, which added the past-due amounts to the principal balance of the loan and brought the Kellys current on their loan. (Ver. Compl., Ex. 2, Fixed Rate Loan Modification Agreement.)

The Kellys defaulted on the modified loan. In June 2008, Wells Fargo approved them for another partial reinstatement/repayment agreement. (Def. App'x at 15-16, June 24, 2008, Stipulated Partial Reinstatement/Repayment Agreement.) The Kellys defaulted on the 2008 modification. (Def. App'x at 17, July 9, 2008, Letter from Wells Fargo to the Kellys.)

## 2.    HAMP

In 2008, Congress enacted the Troubled Asset Relief Program ("TARP") and the Making Home Affordable Program, which included the Home Affordable Modification Program ("HAMP"). See 12 U.S.C. §§ 5211, 5219. In April 2009, Wells Fargo entered into a Servicer Participation Agreement with Fannie Mae to administer HAMP. (Second Eaton Aff., Ex. R, Commitment to Purchase Financial Instrument and Servicer Participation Agreement.)

3.      **2009 TPP**

In 2009, Wells Fargo conducted an analysis of the Kellys' financial and

loan information, and determined that they were eligible for Wells Fargo to offer

a HAMP trial program to them.  (First Eaton Aff., Ex. D; First Eaton Aff., Ex. A,

Bosier Dep. 25-31.)

On August 26, 2009, Wells Fargo sent the Kellys a HAMP trial period plan

("2009 TPP").  (First Eaton Aff., Ex. E, 2009 TPP.)  The 2009 TPP letter stated:

> **You may qualify for a Home Affordable Modification Trial Period**
> **Plan – a way to make your payment more affordable.**
>
> We have enclosed a customized Home Affordable Modification Trial
> Period Plan ("Trial Period Plan").  If you qualify under the federal
> government's Home Affordable Modification program and comply
> with the terms of the Trial Period Plan, we will modify your
> mortgage loan and you can avoid foreclosure.

(2009 TPP at 4679.)  The letter explained that participation in the plan required

the Kellys to provide documentation for all income they received and to make

the TPP loan payments during the trial period.  (Id. at 4679-80, 4690.)  The

enclosed 2009 TPP was entitled "Home Affordable Modification Program Loan

Trial Period (Step One of Two-Step Documentation Process)."  (2009 TPP at

Wells Fargo 4683-88.)  This document stated, in part:

> If I am in compliance with this Loan Trial Period and my
> representations in Section 1 continue to be true in all material

4

respects, then the Lender will provide me with a Loan Modification
Agreement, as set forth in Section 3, that would amend and
supplement (1) the Mortgage on the Property, and (2) the Note
secured by the Mortgage.

(Id. at 4683.)

It further stated:

If prior to the Modification Effective Date, (i) the Lender does not
provide me a fully executed copy of this Plan and the Modification
Agreement; (ii) I have not made the Trial Period payments required
under Section 2 of this Plan; or (iii) the Lender determines that my
representations in Section 1 are no longer true and correct, the Loan
Documents will not be modified and this Plan will terminate.  In this
event, the Lender will have all of the rights and remedies provided
by the Loan Documents, and any payment I make under this Plan
shall be applied to amounts I owe under the Loan Documents and
shall not be refunded to me;

(Id. at 4684.)

Furthermore,

I understand that the Plan is not a modification of the Loan
Documents and that the Loan Documents will not be modified
unless and until (i) I meet all of the conditions required for
modification, (ii) I receive a fully executed copy of a Modification
Agreement, and (iii) the Modification Effective Date has passed.  I
further understand and agree that the Lender will not be obligated
or bound to make any modification of the Loan Documents if I fail
to meet any one of the requirements under this Plan.

(Id.)

Finally, it notes:

> I understand that once Lender is able to determine the final amounts
> of unpaid interest and any other delinquent amounts (except late
> charges) to be added to my loan balance and after deducting from
> my loan balance any remaining money held at the end of the Trial
> Period under Section 2.D. above, the Lender will determine the new
> payment amount.  If I comply with the requirements in Section 2
> and my representations in Section 2 continue to be true in all
> material respects, the Lender will send me a Modification
> Agreement for my signature which will modify my Loan
> Documents as necessary to reflect the new payment amount and
> waive any unpaid late charges accrued to date.

(Id. at 4684-85.)

The 2009 TPP provided that the Kellys were required to make payments of

$2,180.60 on or before October 1, 2009; November 1, 2009; and December 1, 2009.

(2009 TPP at 4684.)

On September 27, 2009, the Kellys signed and returned the 2009 TPP.

(First Eaton Aff, Ex. F; First Eaton Aff., Ex. A, Bosier Dep. 38.)  The Kellys claim

that they also sent Wells Fargo all of the additional documents requested in the

2009 TPP letter.  (First Eaton Aff., Ex. B, P. Kelly Dep. 51-52.)

### 4.    The Parties' Conduct under the 2009 TPP

The Kellys made the three trial payments as set forth in the 2009 TPP.

(First Eaton Aff., Ex. B, P. Kelly Dep. 57; First Eaton Aff., Ex. G.)

On October 28, 2009, Wells Fargo sent a letter to the Kellys stating that

they were prequalified "for a loan modification program" and that it had sent

them a loan modification agreement that they needed to sign.  The letter stated,

> To assist you, a representative from Titanium Systems may come to
> your home to offer assistance answering any questions that you may
> have and to collect the completed documents required to begin your
> mortgage assistance program.  So, please don't be concerned if
> someone knocks on the door.  They are our representatives, and are
> there to help you with the documents, if needed.

(First Eaton Aff., Ex. H, Oct. 28, 2009 Letter from Wells Fargo to the Kellys.)

Titanium Systems ("Titanium") was a third-party vendor that Wells Fargo used

at the beginning of the HAMP program to go to borrowers' homes, obtain

financial information that Wells Fargo needed, and send the documents to Wells

Fargo.  (First Eaton Aff., Ex. A, Bosier Dep. 44-45.)

According to the Kellys, a Titanium representative named Catherine came

to their door in early or mid-November 2009.  (First Eaton Aff., Ex. B, P. Kelly

Dep. 62-63.)  Catherine had a checklist of information with her.  (Id.)  The Kellys

had copies of most of the documents that Catherine needed because they had

already sent them to Wells Fargo with the 2009 TPP and they scanned and

printed additional documents for her.  (Id. 63-64.)  The only information that the

Kellys did not have at that moment was tax information.  (Id. 63.)  Catherine

filled out a worksheet with the Kellys' income and expenses, which they signed. (Id. 63-64.)  They asked her if she needed actual copies of their bills, and she stated that "ballpark" figures were sufficient.  (Id. 64.)  Catherine confirmed that she had all of the Kellys' documents except for the tax information.  (Id. 66.)  She stated that she still needed their W-2 forms.  (Id. 66-67.)  The Kellys claim that they got copies of their W-2s from their accountant and faxed them to Catherine two days later; they also faxed the information to Wells Fargo.  (Id. 67.)

A Wells Fargo summary makes no mention of documents received in November 2009.  (First Eaton Aff., Ex. I at 953.)  Wells Fargo's loss mitigation records show no documents received at this time.  (First Eaton Aff., Ex. J; First Eaton Aff., Ex. A, Bosier Dep. 48.)  However, Wells Fargo's records do show that it sent the Titanium representative to the Kellys' house in November 2009.  (First Eaton Aff., Ex. A, Bosier Dep. 49-50; First Eaton Aff., Ex. J.)

On December 9, 2009, the Kellys received a letter from Wells Fargo, again stating that a Titanium representative might come to their house to answer questions and collect completed documents.  (First Eaton Aff., Ex. K; First Eaton Aff., Ex. A, Bosier Dep. 45.)  The same Titanium representative returned to the Kellys' house in early or mid-December 2009.  (First Eaton Aff., Ex. B, P. Kelly

Dep. 68-69.)  Peter Kelly gave her all of the documents, including the W-2 forms.

She looked through them and told Peter Kelly that "this is great, this is what I

needed."  (Id.)  He asked her if Wells Fargo had lost the documents, and she said

that they just needed another copy of everything.  (Id.)  After the visit, Peter

Kelly faxed the documents as well.  (Id. 69.)  However, again, Wells Fargo's

records make no mention of the documents from the Kellys.  (First Eaton, Aff.,

Ex. I; First Eaton Aff., Ex. J.)

On December 21, 2009, Wells Fargo sent a letter to the Kellys stating:

Thank you for the time you've already invested to modify your
existing mortgage under the *Home Affordable Modification Program*.
As a reminder, you are still in the Trial Period Plan of this program,
which requires you to make three timely trial period payments and
provide specific documentation to complete your qualification for
this program.  Please understand that we cannot complete this
modification process until we receive all the required documents.

(First Eaton Aff., Ex. L, Dec. 21, 2009 Letter from Wells Fargo to the Kellys.)  The

letter further stated:

As of the date of this letter, we still need the documents that are
listed below.  We want to help you, but we must receive these
documents from you before we can move forward with the
mortgage payment relief available under the *Home Affordable
Modification Program*.

(Id.)  The letter then requested the following documents by December 26, 2009, which the Kellys claim that had already provided both to the Titanium representative and directly to Wells Fargo (First Eaton Aff., Ex. B, P. Kelly Dep. 59-60): two signed and dated copies of the TPP, the Hardship Affidavit, signed IRS Form 4506-T (Request for Transcript of Tax Return), and documentation to verify each borrower's income, which for salaried employees, meant a copy of the most recent filed federal tax return and copies of the two most recent pay stubs.  (Dec. 21, 2009 Letter from Wells Fargo to the Kellys.)

According to Wells Fargo, it called the Kellys on January 4, 2010, and left a message regarding the missing documents.  (Def. App'x  at 24.)

On January 12, 2010, Wells Fargo sent the Kellys a letter stating that, by February 11, it needed the same documents listed in the December 21, 2009 letter. (First Eaton Aff., Ex. M; Bosier Dep. 56-57.)

According to Wells Fargo's records, on February 8, 2010, Peter Kelly called Wells Fargo and stated that he was sending the documents that day.  (Def. App'x 23.)  Peter Kelly testified, however, that he did not send any documents after receiving the January 12 letter.  (Def. App'x 119, P. Kelly Dep. 75.)

### 5.      Denial of Permanent Loan Modification

On April 5, 2010, Wells Fargo sent a letter to the Kellys stating:

> We are unable to offer you a Home Affordable Modification because you did not provide us with the documents we requested.  A notice which listed the specific documents we needed and the time frame required to provide them was sent to you more than 30 days ago.
>
> Any trial period payments you have made will be applied to your mortgage loan in accordance with your current loan documents.

(First Eaton Aff., Ex. O.)

### 6.      2012 TPP

In February 2012, Wells Fargo offered the Kellys another HAMP trial period plan ("2012 TPP").  (Def. App'x 28-33.)  During the trial period, Wells Fargo discovered through public records that there were two judgment liens on the Kellys' property.  (Id. 36-37.)  In March 2012, Wells Fargo informed the Kellys that the judgments liens must be cleared or subordinated in order for the loan modification to proceed.  (Id. 34-35.)  On December 18, 2012, Wells Fargo informed the Kellys that they were ineligible for a loan modification because the liens remained on their property.  (Id. 39-41.)

### 7. Foreclosure

On May 13, 2013, Wells Fargo noticed a mortgage foreclosure sale of the Kellys' home. On July 11, 2013, the sheriff sold their house to Wells Fargo for $405,000. (Am. Compl. ¶ 72; Answer ¶ 46.) The six-month redemption period expired, and the Kellys did not redeem the property from foreclosure. On January 21, 2014, Wells Fargo quit claimed its interest in the Kellys' house to Freddie Mac. (Am. Compl. ¶ 73; Answer ¶ 47.)

### B. Procedural History

On July 25, 2014, the Kellys commenced an action against Wells Fargo and Freddie Mac in Carver County District Court. On August 11, 2014, Wells Fargo and Freddie Mac removed the matter to this Court based on federal question jurisdiction. [Docket No. 1] On September 15, 2014, the Kellys filed an Amended Complaint against Wells Fargo and Freddie Mac alleging: Count One: Violation of Mortgage Servicer Standards of Conduct, Minn. Stat. § 58.13; Count Two: Quiet Title, Minn. Stat. § 559.01; Count Three: Accounting; Count Four: Breach of Contract, the 2009 TPP and 2012 TPP; Count Five: Promissory Estoppel; and Count Six: Breach of Contract, the Mortgage. [Docket No. 12]

The parties have filed cross motions for summary judgment. [Docket Nos. 37, 44] The Kellys have withdrawn their request for an accounting and concede any claims based on the 2012 TPP. ([Docket No. 55] Pls.' Opp. at 20, 35.)

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.   Count One: Violation of Mortgage Servicer Standards of Conduct, Minn. Stat. § 58.13

HAMP does not provide a private cause of action; however, Plaintiffs assert that they have standing to enforce HAMP through the Minnesota

Residential Mortgage Originator and Servicer Licensing Act.  Minn. Stat. §§ 58.13, 58.18.  The statute provides that "[a] borrower injured by a violation of the standards, duties, prohibitions, or requirements of sections 58.13 . . . shall have a private right of action."  Minn. Stat. § 58.18, subd. 1.  However, "[t]his section does not apply to a residential mortgage loan originated by a federal or state chartered bank, savings bank, or credit union."  Id., subd. 4.

Wells Fargo Home Mortgage, Inc., which is not a federally chartered bank, originated the Kellys' loan, and, at the time the loan was originated, it was a subsidiary of Wells Fargo Bank, N.A.  (Def. App'x 2; First Eaton Aff., Ex. A, Bosier Dep. 12-13.)  Wells Fargo Bank, N.A., took ownership of the loan after it was originated.  It is undisputed that Wells Fargo Bank, N.A., is a national bank under the National Bank Act and, therefore, is classified as a federally chartered bank.  See Atherton v. FDIC, 519 U.S. 213, 219 (1997).  The U.S. Supreme Court has established that, for preemption purposes, a wholly owned mortgage-lending subsidiary of a federal chartered bank must be treated as a federally chartered bank, outside the reach of state regulation.  See Watters v. Wachovia Bank, N.A., 550 U.S. 1, 18, 21 (2007) (holding that the National Bank Act's preemption is determined based on "the exercise of a national bank's powers, not

14

on its corporate structure"). Therefore, under <u>Watters</u>, the Minnesota statute does not apply to provide a private right of action with regard to the Kellys' loan which was originated by Wells Fargo's wholly owned subsidiary. Count One must be dismissed.

### C.      Count Two: Quiet Title, Minn. Stat. § 559.01

Because the Court grants summary judgment to Wells Fargo on all substantive claims, there is no basis to convert title back to the Kellys. Thus, Wells Fargo is entitled to summary judgment on the quiet title claim.

### D.      Count Three: Accounting

Plaintiffs request that the Court dismiss Count Three. Therefore, the Court dismisses Count Three.

### E.      Count Four: Breach of Contract: 2009 HAMP Trial Loan Period Agreement

The Court dismisses the Kellys' claim that Wells Fargo breached the 2009 TPP by failing to uphold its promise of a permanent loan modification, because the 2009 TPP is not an enforceable contract under Minnesota law.

"The elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant."

Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co., 848 N.W.2d 539, 543 (Minn. 2014)

(citation omitted).  "The formation of a contract requires communication of a

specific and definite offer, acceptance, and consideration.  Whether a contract is

formed is judged by the objective conduct of the parties and not their subjective

intent."  Commercial Assocs., Inc. v. Work Connection, Inc., 712 N.W.2d 772, 782

(Minn. Ct. App. 2006) (citations omitted).

Here, the TPP is not an enforceable contract because the TPP itself states

that it is not a modification of the loan and that no modification agreement will

be forthcoming until Wells Fargo provides Plaintiffs with a fully executed copy

of the agreement.  Wittkowski v. PNC Mortgage, Civil No. 11–1602, 2011 WL

5838517, at *4 (D. Minn. Nov. 18, 2011).

Additionally, the 2009 TPP is unenforceable due to Minnesota's credit

statute of frauds.  The Minnesota Credit Agreement Statute of Frauds provides:

"A debtor may not maintain an action on a credit agreement unless the

agreement is in writing, expresses consideration, sets forth the relevant terms

and conditions, and is signed by the creditor and the debtor."  Minn. Stat. §

513.33, subd. 2.  "'[C]redit agreement' means an agreement to lend or forbear

repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation . . . ." Id., subd. 1(1).

The 2009 TPP did not satisfy Minnesota's credit statute of frauds because it did not state any of the most relevant terms of a credit agreement, such as the interest rate, the monthly payment amount, or the remaining loan balance. See, e.g., Wittkowski, 2011 WL 5838517, at *4; Racutt v. U.S. Bank, N.A., No. CIV. 11-2948 (PAM/JJK), 2012 WL 1242320, at *2 (D. Minn. Feb. 23, 2012); Laurent v. Mortgage Elec. Registration Sys., Inc., No. CIV. 11-2585 (ADM/JJG), 2011 WL 6888800, at *2 (D. Minn. Dec. 30, 2011). Topchian v. JPMorgan Chase Bank, N.A., does not require a different outcome because Topchian addressed Missouri, not Minnesota, law, did not analyze a credit statute of frauds, and addressed a different issue – whether the actual final modification contract was enforceable, not the TPP. 760 F.3d 843, 850 (8th Cir. 2014).

A general explanation of how the relevant terms of the modified loan would be calculated is not the equivalent of "set[ting] forth the relevant terms" themselves, as required under § 513.33. The letter accompanying the 2009 TPP explains that items such as real estate taxes, unpaid interest, insurance premiums, and certain assessments, all defined as the "Past Due Arrearage

Amount," "will be added to your mortgage loan balance." (2009 TPP at 4681.) However, the letter explains, "At this time, we are not able to calculate precisely the Past Due Arrearage Amount or the amount of the modified loan payment that will be due after successful completion of the trial period." (Id.) Thus, the TPP makes clear that Wells Fargo was "not able to calculate" the payment that would be due under the modified loan and, thus, it was not "set[ting] forth the relevant terms" in the 2009 TPP. The HAMP guidelines and any calculations contemplated within the HAMP guidelines are not set forth in the 2009 TPP itself; nor would they provide all of the relevant terms and conditions as required by § 513.33.

Finally, the Court notes that the credit statute of frauds is not met because the 2009 TPP was not "signed by the creditor and the debtor." Minn. Stat. § 513.33, subd. 2.

Because the 2009 TPP is not an enforceable contract under Minnesota law, the breach of contract claim must be dismissed. Additionally, an enforceable contract must exist before the duty of good faith and fair dealing can be implied. See Cox v. Mortgage Elec. Registration Sys., Inc., 685 F.3d 663, 670 (8th Cir. 2012).

Thus, no action for breach of the implied covenant of good faith and fair dealing

based on the 2009 TPP can survive.

### F.    Count Four: Breach of Contract: 2012 TPP

Plaintiffs concede to dismissal of Count Four to the extent that it is based

on the 2012 TPP.

### G.    Count Five: Promissory Estoppel

> Promissory estoppel is an equitable doctrine that impl[ies] a contract
> in law where none exists in fact.  It requires proof that 1) a clear and
> definite promise was made, 2) the promisor intended to induce
> reliance and the promisee in fact relied to his or her detriment, and
> 3) the promise must be enforced to prevent injustice.

Martens v. Minn. Min. & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000) (citations

omitted).

The Court grants summary judgment to Defendants on the promissory

estoppel claim because Plaintiffs cannot show detrimental reliance.  Plaintiffs

argue that they made the trial payments to Wells Fargo in reliance on the 2009

TPP, but Plaintiffs were already legally obligated to make larger monthly

payments to Wells Fargo under their mortgage and note.  (Def. Second Supp.

App'x, P. Kelly Dep. 187-88.)  Plaintiffs continued to live in the home and all of

the trial payments that they made were credited to their loan balance.  (Id. 189.)

Because Plaintiffs were doing something that they were required to do anyway –

19

making a loan payment – there was no detrimental reliance.  See, e.g., Doran v. Selene Fin., LP, No. 12-CV-886 (SRN/FLN), 2013 WL 53840, at *4 (D. Minn. Jan. 3, 2013); Bohnhoff v. Wells Fargo Bank, N.A., 853 F. Supp. 2d 849, 857 (D. Minn. 2012).

Plaintiffs also claim that they made improvements to their home in reliance on the TPP, but they point to no evidence to support this assertion.  Peter Kelly's testimony shows that most of the improvements were done after April 2010, when Plaintiffs knew that they had been rejected for the 2009 TPP modification.  For example, they replaced an air conditioner in 2012 (P. Kelly Dep. 177), painted the interior from 2010 through 2014 (id. 176), fixed an oven and replaced a refrigerator and dishwasher in 2014 (id. 175), refurbished the fence in 2013 (id. 174-75), painted the exterior of the house in 2013 (id. 174), fixed the sidewalk in 2012 (id. 173), completed landscaping projects from 2011 through 2014 (id. 173-74), and put in a new driveway in May 2011 (id. 172-73).  None of these improvements could have been done in reliance on any statement Wells Fargo made in the 2009 TPP because Wells Fargo informed the Kellys that they were not approved for a permanent modification in April 2010.  The Kellys replaced some ruined carpet in 2010, but there is no evidence that this

replacement occurred before the modification was denied in April 2010.  (See id. 176.)  Other repairs were completed before Wells Fargo sent the 2009 TPP to the Kellys in August 2009.  (See id. 176-78 (testifying that the air conditioner was replaced in 2007, another HVAC repair occurred in 2008, a blower had to be repaired multiple times between 2007 and 2014, the floors were repaired in 2008 or 2009, and fixtures, such as shower heads, faucets, and a toilet, had to be fixed at unspecified times between 2007 and 2015).)  The Kellys point to no particular project that they undertook in reliance on Wells Fargo's representations after receiving the 2009 TPP in August 2009 and before they were denied the modification in April 2010.  In any case, Peter Kelly testified that Wells Fargo never actually told him that they would be approved for the modification.  (Id. 114, 172.).

Because there is no evidence of detrimental reliance, Count Five must be dismissed, and the Court need not address the parties' arguments regarding the remaining elements of promissory estoppel.

### H.    Count Six: Breach of Contract, the Mortgage.

Plaintiffs assert that Wells Fargo breached the implied covenant of good faith and fair dealing in their mortgage by failing to competently administer their loan modification.

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract." In re Hennepin Cty. 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995) (citations omitted). The mortgage contains no language about the possibility of a loan modification or a promise to consider the Kellys for an alternative payment plan. See Ming'ate v. Bank of Am., N.A., No. Civ. 11-1787 (ADM/TNL), 2011 WL 4590431, at *5 (D. Minn. Sept. 30, 2011). There is no evidence that Wells Fargo prevented the Kellys from performing their responsibilities under the mortgage – making their loan payments. The mortgage did not provide a right to modify. Any negative actions that Wells Fargo took were in relation to the attempt to negotiate a loan modification; thus, the actions did not hinder the Kellys' performance under the original mortgage. Wells Fargo is entitled to summary judgment on Count Six.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.   Defendants' Motion for Summary Judgment [Docket No. 37] is **GRANTED** and this matter is **DISMISSED WITH PREJUDICE**.

2.    Plaintiffs' Motion for Summary Judgment [Docket No. 44] is
      **DENIED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   April 24, 2016            s/ Michael J. Davis
                                   Michael J. Davis
                                   United States District Court